(C. D. 676)

AMERICAN SMELTING & REFINING CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided August 24, 1942)

*B. A. McKenzie; Lawrence & Tuttle* (*George R. Tuttle* and *Chas. F. Lawrence,* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Richard F. Weeks, Joseph E. Weil,* and *Francis X. O'Donnell, Jr.,* special attorneys), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: These are suits against the United States arising at Tacoma, a subport of the port of Seattle, brought to recover certain taxes alleged to have been improperly imposed on particular importations consisting of metallic substances. There are three items involved in the two cases which have been consolidated herein. The first is described on the invoice covered by protest 8632–K as "Lot 219 (11) 102 Bags Crude metallic mineral substance (resi-

dues).'' The second item, on the same invoice, is described as ''Lot 220 (12) 14 casks Crude metallic mineral substances (residues).'' The third item is described on the invoice accompanying the entry covered by protest 13415–K as ''925 Bags Copper Residues.''

The merchandise in said lot No. 219 was classified as entitled to free entry under paragraph 1657 of the Tariff Act of 1930 as ''Composition metal of which copper is the component material of chief value, not specially provided for.'' The merchandise in said lot No. 220 was classified as entitled to free entry under the provision in paragraph 1658 of said act for regulus of copper. The merchandise described as ''925 Bags Copper Residues'' was classified as entitled to free entry under said paragraph 1657 as ''Composition metal of which copper is the component material of chief value, not specially provided for.''

Although no duty was levied on said merchandise under the Tariff Act of 1930, the collector did impose on the copper contained therein a tax at the rate of 4 cents per pound under the following provision in section 601 (c) (7) of the Revenue Act of 1932:

Copper-bearing ores and concentrates and articles provided for in paragraph 316, 380, 381, 387, 1620, 1634, 1657, 1658, or 1659 of the Tariff Act of 1930, 4 cents per pound on the copper contained therein: * * *.

The plaintiff claims that all of said merchandise is properly classifiable under paragraph 1664 of said Tariff Act of 1930 which reads:

Metallic mineral substances in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for.

Inasmuch as said paragraphs 1657, 1658, and 1664 are all in the free list of said tariff act, the only question to be here determined is under which of said paragraphs is the involved merchandise properly classifiable. Obviously, if it is within the purview of paragraph 1657 or 1658, then the collector correctly imposed thereon a tax of 4 cents per pound on the copper content. But if the merchandise properly falls within the provisions of said paragraph 1664, then it was error to impose thereon any copper tax under the Revenue Act of 1932.

At the first hearing, held at Tacoma on March 1, 1940, warehouse entry 873–A, with the accompanying consular invoice involved in protest 13415–K, together with a laboratory report of the Government chemist and the summary of entered value, were admitted in evidence as exhibits 1, 2, and 3. At the same time, the warehouse entry, the summary of entered value, with the accompanying consular invoice and the report of the Government chemist in protest 8632–K, were admitted in evidence as exhibits 4, 5, and 6, respectively

The plaintiff then offered in evidence the testimony of four witnesses. The first, John A. Rea, Jr., customs storekeeper at the customs warehouse of the Tacoma Smelters, Tacoma, Wash., for the last 13

years, identified samples of the merchandise at bar, a sample of lot 219 being admitted in evidence as exhibit 7, a sample of lot 220 being admitted in evidence as exhibit 8, and a sample of lot 2662, representing all of the merchandise covered by protest 13415–K, being admitted in evidence as exhibit 9. The witness also stated that he had mailed samples of lots 219, 220, and 2662 to the Government chemist at Chicago.

The plaintiff's second witness, Albert Henry Mellish, a qualified chemist and metallurgical engineer and chief chemist of the plaintiff-corporation since January 1937, testified that he had analyzed samples from lots 219, 220, and 2662 with the following results:

|  | Lot 219 Exhibit 7 | Lot 220 Exhibit 8 | Lot 2662 Exhibit 9 |
|---|---|---|---|
| Gold | None | .03 oz. per ton | .03 oz. per ton |
| Silver | .66 oz. per ton | 1.86 " " " | .63 " " " |
| Lead | 1.54 per cent | 3.32 per cent | 1.4 per cent |
| Copper | 30.67 " " | 47.69 " " | 30.96 " " |
| Zinc | 24.03 " " | 13.91 " " | 22.61 " " |
| Iron | 2.9 " " | 2.3 " " | 2.00 " " |
| Lime | .6 " " | .5 " " | .1 " " |
| Silica | 23.4 " " | 18.9 " " | 25.5 " " |
| Alumina | 3.8 " " | 3.0 " " | 4.2 " " |
| Sulphur | .2 " " | 2.2 " " | .1 " " |
| Nickel | | | .13 " " |

At this point, for the convenience of the court and over objection of counsel for the Government, printed analyses of lots 219, 220, and 2662, signed by the witness, were admitted in evidence as collective exhibit 10.

The witness stated that in his opinion all of the merchandise represented by exhibits 7, 8, and 9 consisted of foundry ash or residue, and that none of it consisted of copper ore, regulus of copper, or old copper.

On cross-examination the witness testified in part as follows:

X Q. In the process of manipulation or fabrication, or smelting of the imported products, was any zinc retrieved?—A. We didn't recover any merchantable zinc.

X Q. Did you recover any copper?—A. We recovered copper.

X Q. Did you recover any gold?—A. Yes.

X Q. Silver?—A. Yes.

\*     \*     \*     \*     \*     \*     \*

X Q. Sulphur?—A. We recovered no sulphur.

X Q. Nickel?—A. Nickel is partially recovered.

\*     \*     \*     \*     \*     \*     \*

X Q. So that the principal thing you recovered is copper, gold, and silver; is that correct?—A. Yes.

The plaintiff's third witness, Earl R. Marble, general superintendent of the Tacoma Smelting Co. and a qualified chemist and chemical engineer, testified that copper ore was a metallic-bearing substance

in its natural state or such metallic substance which has been treated by mechanical means, which is known as a concentrate; that regulus is a term which has long since passed out of the nomenclature of smelting men, being an antiquated term to describe black copper made from the smelting process of blast furnaces; that black or coarse copper is the product of what is known as black smelting or the blast furnace process which is unknown today; that cement copper is the product which is shipped to a smelter and obtained in the precipitation of copper from mine waters, or from chemical solution; that old copper is any copper that has been processed once and is fit only for remanufacture; that copper scale is the designation usually given to oxide of copper resulting from heating copper in the rolling mill process; and that in the trimming of a roll or sheet of copper part of the material is clipped off, and the part clipped off is known as clippings.

The witness further testified that he was familiar with copper in plates, bars, ingots, and pigs; that the articles constituting the merchandise at bar, and represented by exhibits 7, 8, and 9, answered to none of the above descriptions or classifications; that composition metal is a combination of metals having fusible metallic characteristics; that brass and bronze are typical examples of composition metals; that collective exhibit 10 discloses that the merchandise at bar consists of metallic mineral substances; and that the merchandise represented by exhibits 7 and 9 is similar to the material usually found on the floor of a brass foundry, whereas the merchandise represented by exhibit 8 has been screened.

On cross-examination the witness testified in part as follows:

X Q. I ask you, sir, do you know what the word "crude" means?—A. I do.

X Q. Does that mean the natural state?—A. Not necessarily.

X Q. What would you say "crude" meant?—A. It may mean an impure or an unrefined material.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. What is a crude metallic mineral substance?—A. A crude metallic mineral substance is any mineral substance which in the state in which it then exists, cannot be used commercially.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. You say that that is the meaning of a crude, mineral metallic substance in the trade; is that right?—A. Yes.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Now, did I understand you to say that the term "regulus of copper ore" was more or less antiquated, or not in use?—A. I refer to its use by smelter men.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Did you ever buy it?—A. Buy regulus?

X Q. Yes.—Not under that name, no.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. I want to know when was the last time that you heard the term "black" or "coarse copper" used——of copper ore?—A. I saw black copper last produced in

the summer of 1935, at our Baltimore plant, and I assume that that was probably the last black copper which was made for sometime, * * *.

On redirect examination the witness testified in part as follows:

R.Q. Referring to the analysis that counsel has given you, could composition metal or a crude metallic mineral substance, both have approximately the same analysis?—A. They could have exactly the same analysis.

> \*   \*   \*   \*   \*   \*   \*

On recross-examination the witness testified in part as follows:

R.X Q. When you say "regulus" you understand it to be black copper?—A. It can mean among other things black copper.

R.X Q. It can mean either black copper or antimony, is that right?—A. "Regulus" as it was used years ago, can mean at the present time copper matte.

R.X Q. What is copper matte?—A. Copper matte is the sulphide of copper, plus sulphide of iron, with other contaminating elements. You can have a little lead, nickel, or zinc present in the matte, all as sulphide.

At this first hearing the Government called as a witness Beecher A. McKenzie, customs broker, who testified in part as follows:

Q. Now, I show you the invoice of purchased merchandise, invoice No. 905, protest 13415-K, and ask you whether you made the ink notation in brackets, "brass foundry ash"?

> \*   \*   \*   \*   \*   \*   \*

A. I did. I put the words that are in parentheses, "brass foundry ash," which are below the words "copper residues."

> \*   \*   \*   \*   \*   \*   \*

Q. I now show you invoice 2032, of protest 8632-K, and ask you whether you wrote the words, "Residues, free, paragraph 1664."—A. I did.

At the second hearing, held at Tacoma on October 26, 1940, before Evans, Judge, the plaintiff recalled the witness Earl R. Marble for the purpose of correcting his testimony in certain particulars. This additional testimony, so far as here pertinent, reads as follows:

Q. I show you these three exhibits, Mr. Marble, Exhibit 9, This is Exhibit 8, and this one, Exhibit 7, and ask you whether those exhibits are what you recognize to be brass foundry ash?—A. Yes, these are brass foundry ash.

Q. On page 76 of the record you have there, would you examine the middle of that page, the question reading as follows: "Would you say in your vast experience that that is composition metal?" And your answer there is, "Yes, First, I must be able to see that product physically before I can make any such statement as that, because an analysis of itself does not determine the product whatsoever." Did you intend to give that answer to that question, to say that those exhibits were composition metal?—A. No. The word "yes" should be stricken.

> \*   \*   \*   \*   \*   \*   \*

Cross-examination by Mr. Weeks:

X Q. Mr. Marble, there is a term applied to copper, is there not, called matte, m-a-t-t-e?—A. Yes.

X Q. There used to be a term called regulus applied to copper?—A. Yes.

X Q. I understand now that term regulus is obsolete?—A. It is obsolete to smelting men. It is still used in some respects, I believe, in court procedure.

X Q. Is it true that the term matte now means the same thing that the term regulus used to mean?—A. Yes, practically the same.

X Q. So you could use them synonymously?—A. Yes.

Counsel for the Government then offered in evidence the testimony of R. G. LaMotte, a qualified metallurgist and mining engineer, who testified that he had practical experience in smelting all sorts of copper ores and concentrates, including residues; that he had never come across any such thing as composition metal in chief value of copper; that he was thoroughly familiar with copper matte or copper regulus; that having examined exhibit 9 and having been given its chemical analysis, in his opinion it was a copper concentrate; that brass foundry ash contained sand from the molds, metallic brass, and white zinc oxide; and that in his opinion exhibit 9 was not brass foundry ash, and neither was exhibit 7 nor exhibit 8 brass foundry ash.

On cross-examination the witness testified in part as follows:

X Q. And when was it that you worked in the brass foundry?—A. Well, I didn't actually work in the brass foundry. I sampled, but that isn't considered working in the foundry. You just take a number of samples in the brass foundry.

\* \* \* \* \* . \* \*

X Q. When you say you sampled in that brass foundry, just what do you mean?—A. You just take the material.

X Q. Draw samples from what is available on the floors?—A. Yes.

\* \* \* \* \* \* \*

X Q. Did you ever while you were employed in that work analyze brass foundry ash?—A. Yes, once a month.

\* \* \* \* \* \* \*

X Q. Did you make a microscopic analysis?—A. Yes.

\* \* \* \* \* \* \*

X Q. Have you done that in respect to those exhibits before the court, Exhibits 7, 8, and 9, about which you testified?—A. Not with a glass, but I looked at them, just gave them a visual examination.

X Q. And where was that?—A. In the office.

X Q. You mean in the courtroom?—A. Yes.

\* \* \* \* \* \* \*

X Q. What, in your opinion, is the form of Exhibits 7, 8, and 9? Is that crude material?—A. I would say there was some screenings in them.

\* \* \* \* \* \* \*

X Q. Would you look at each one of them and tell us whether you feel certain that each one of those has been screened?—A. Yes, this material has been screened.

\* \* \* \* \* \* \*

X Q. I suppose that is the only reason you say they are not in a crude form? You believe they have been screened?—A. They have been screened and subjected to concentration by a magnetic separator, \* \* \*.

X Q. I assume you are qualified, Mr. LaMotte, to say whether Exhibits 7, 8, and 9, is copper ore, in your estimation.—A. It is a copper product. I cannot say whether it is copper ore, or not.

X Q. Can you say whether it is regulus of copper?—A. It is not a regulus, according to the analysis.

X Q. Can you say whether it is black or coarse copper?—A. No, it is not.

\*     \*     \*     \*     \*     \*     \*

X Q. Is Exhibits 7, 8, or 9, cement copper?—A. It is not.

X Q. Is it not old copper?—A. No.

X Q. Or old copper fit only for remanufacture?—A. No.

X Q. Do you say it is not copper in plates, bars, ingots, or pigs?—A. No, it is not that.

\*     \*     \*     \*     \*     \*     \*

X Q. So far as you are familiar with the term, is composition metal a homogeneous product?—A. Yes, I should think it would be.

X Q. I want to revert back to 1907 when you had something to do with a brass foundry. I believe you stated you made analyses of what you considered to be brass foundry ash once a month.—A. Yes.

\*     \*     \*     \*     \*     \*     \*

X Q. Did you, during all that time, find what you considered to be brass foundry ash to be consistently the same, as far as an analysis was concerned?—A. Yes, very much so; except sometimes we would get bronze mixed with it. \* \* \*.

\*     \*     \*     \*     \*     \*     \*

X Q. In your analysis \* \* \* was there more or less a regular consistency in the relationship of the proportion of copper and zinc?—A. Yes, there was.

X Q. About what was that proportion?—A. It ran about seventy-thirty.

X Q. Of what?—A. Seventy per cent copper, and thirty per cent zinc.

X Q. Do you find that percentage here?—A. The ratio is that the zinc is higher; it is sixty-forty.

X Q. In your opinion, is that difference sufficient to preclude the possibility of this material being brass foundry ash; that is having the ratio of sixty-forty instead of seventy-thirty?—A. Not preclude it, but it is not likely.

On recross-examination the witness testified in part as follows:

R. X Q. I wonder if you would look at Exhibits 7, 8, and 9, again and tell us whether foundry sand is not visible there to you?

\*     \*     \*     \*     \*     \*     \*

A. I would need a glass.

R. X Q. In order to determine that?—A. Yes.

R. X Q. Your conclusions, that you previously gave, were made from an examination without the aid of a glass?—A. That's right.

R. X Q. And this last analysis that has been referred to you with gold .03 per cent; silver, 1.86 per cent; lead 3.32 per cent; copper, 47.69 per cent, zinc, 13.91 per cent, and so on, wouldn't that be a 75 to 25 per cent brass foundry ash?—A. It would be very close to it.

At the third and final hearing, held at Tacoma on November 14, 1941, the plaintiff offered in evidence the deposition of Henry B. Taylor, Government chemist at the port of Chicago, which was admitted as collective exhibit 11. A document giving each question followed by its answer, for the convenience of the court, was admitted in evidence as exhibit 11–A. Some of the answers to the interrogatories were objected to by counsel for the Government on the ground that the affiant was not qualified.

It appears from said deposition that the affiant, Taylor, received the degree of mining engineer from the School of Mines of Columbia University in 1906; that he did graduate work at said university in geology and metallurgy in 1912, receiving his master's degree in the latter year; that in 1913 he was chemist for the Lake Superior Smelting & Refining Co.; that in 1915 he owned and ran an assay office at Lake City, Colo., being engaged in exploration work in his own behalf; that from 1915 to 1918 he served as chemist for the Bartlesville Zinc Co. of Oklahoma; that in 1918 he became assistant assayer in the United States customs assay office in Kansas City, Mo.; that in 1939 he became chief chemist in charge of the laboratory work of the United States customs service in Chicago, all of the work of that laboratory being under his supervision; that on August 14, 1939, he wrote the deputy collector of customs at Tacoma, Wash., a letter stating that an analysis of the merchandise covered by lots 219 and 220, taken in conjunction with the fine metallic particles throughout the samples, seemed to indicate that they were derived from a residue or ash from a secondary process such as a brass foundry; that on September 11, 1939, in response to a letter from the deputy collector of customs at Tacoma, dated August 25, 1939, submitting samples of said lots 219 and 220, the said Taylor stated that from the analyses and physical appearance of said samples it was his opinion that they may be designated as foundry residue or ash; and that on September 25, 1939, in reply to a letter from the said deputy collector dated September 22, 1939, enclosing sample of lot 2662, it was stated that the sample was probably a foundry residue or ash.

After setting forth the letters in question, the affiant stated that by the term foundry ash he meant a brass foundry ash or a residue from a brass foundry or other nonferrous foundry.

In answer to the question as to what experience he had had with material similar to that involved in the instant case, the affiant stated as follows:

The United States customs laboratory and the United States customs assay office receive samples of residues and foundry ashes imported into the country through the various ports of the United States, and it is the duty of the chemist to determine the character of the material received, and I have done this during my entire employment with the government laboratories whenever such samples were received.

Asked to state the process by which brass foundry ash is obtained, the affiant stated as follows:

Brass foundry ash or residue is obtained as the waste or residue from the pot of molten brass at the time of pouring. It may consist partly of the coke and unfused portion of the charge that covers the molten material, i. e., metal and slag in the pot. That is that portion of the melt that floats on the top as a porous mass, as well as the splashing of metal and coke and slag that may be swept up from the floor around the pot.

Finally, the affiant stated that the samples in question were not any of the following: composition metal of which copper is the component material of chief value, copper ore, regulus of copper, black or coarse copper, copper cement, old copper fit only for remanufacture, copper scale, clippings from new copper, or copper in plates, bars, ingots, or pigs, not manufactured.

In addition to the offering of exhibits 11 and 11–A, the plaintiff recalled the witness, Earl R. Marble, who testified that it was possible with the naked eye to see pieces of copper or brass in exhibits 7, 8, and 9; that by the aid of a magnifying glass it was possible to detect in all three exhibits traces of foundry sand; that in his opinion it was impossible with the naked eye to detect zinc oxide in brass foundry ash; that by the aid of a magnifying glass he could detect a few small particles which he believed to be zinc oxide; and that in his experience with brass foundry ash there was no fixed ratio between the zinc and copper contained therein.

The witness then placed a 15-cent magnet near exhibits 7, 8, and 9, and in each case certain amounts of material adhered to the magnet.

On cross-examination the witness testified in part as follows:

R. X Q. You found some magnetic substance in each sample?—A. Yes.

R. X Q. Just how would magnetic substances enter into brass foundry ash?— A. In the operation of a brass foundry, iron is present in the tools and in their use, in the operation of those tools, it will scrape off and mix with the refuse accumulating on the floor.

R. X Q. Is it your testimony that this is brass foundry ash?—A. Yes.

R. X Q. And that this brass foundry ash is gathered from those impurities resulting from the melting process?—A. It is gathered from the floor and other places in the foundry, mostly from the floor.

The plaintiff then offered in evidence the testimony of Ray G. Young, deputy collector of customs at the port of Tacoma since 1930, who testified that samples of lots 219, 220, and 2662, represented by exhibits 7, 8, and 9, were sent to Doctor Taylor at Chicago by his office.

Upon this record counsel for the Government invites our attention to the fact that merchandise described as copper residues, having an analysis not substantially different from the analyses of the merchandise in the instant case, was the subject of the decision in *American Smelting & Refining Co.* v. *United States*, T. D. 40999, G. A. 9023, 47 Treas. Dec. 854, and was held by this court to be properly classifiable under the provision in paragraph 1555 of the Tariff Act of 1922 for composition metal. It is to be noted, however, that in the Tariff Act of 1930, the Congress has explicitly defined residues and brass foundry ash as metallic mineral substances in a crude state.

According to the overwhelming evidence in the instant cases, including the testimony of the chief Government chemist at the port of Chicago, whose qualifications in our opinion are unquestionable, the merchandise constituting the imported merchandise at bar is brass

foundry ash or brass foundry residue within the meaning of said paragraph 1664. Inasmuch as said paragraph 1664 is not included among those enumerated in section 601 (c) (7) of the Revenue Act of 1932, it follows as a matter of law, and we so hold, that said merchandise is not subject to the provisions of said section and therefore not taxable thereunder, as alleged by the plaintiff. That claim is therefore sustained; but as to all other merchandise the claims are overruled.

Judgment will be rendered accordingly.